JOHN OUTCALT et al., appellant,

*v.*

THE GEORGE W. HELME COMPANY, respondent.

1. The bill averred that the defendant illegally maintained a dam, by means of which back-water was thrown upon the complainant's mill-wheel above, and prayed an injunction against such maintenance. The answer set up a prescriptive right to maintain the dam as it was, and denied that the dam was the cause of the interference with complainant's wheel.—*Held*, that the issues thus presented were not within the jurisdiction of the court of chancery.

2. When the propriety of instituting a suit in equity depends upon the complainant's right having been established at law, and the bill is filed before the right has been so settled, and there will be no necessity for further relief in equity if the defendant shall conform to the rights which the judgment at law may establish against him, then the bill should not ordinarily be retained pending the legal litigation.

On appeal from a decree advised by the chancellor, whose opinion follows:

THE CHANCELLOR.

This suit is brought by the owners of the Railroad Mills, which are situated on Little Mill brook, in Middlesex county, against John Outcalt, and David D. Acker, as trustee, and Cor-

nelius B. Outcalt, as *cestui que trust*, in reference to the dam at Outcalt's mills, on the Manalapan river, into which river Little Mill brook empties. The mills of both parties are run by water-power, supplied by their ponds near their mills. The complainants employ steam-power also. Outcalt's mills are used for the grinding of hominy, and the Railroad Mills for manufacturing snuff and tobacco, and the latter are a large and valuable property, in which is conducted an extensive and profitable business. The complainants allege that the dam at Outcalt's mills, which are about a mile and a third below the Railroad Mills (which are near the junction of the Manalapan and the brook), has, since about 1872, been unlawfully kept at too great a height, and that by reason thereof the water of the Manalapan and the brook, which latter is the tail-race of the Railroad Mills, has been backed up upon the plank platforms or sheathing under the water-wheels to such a height as to interfere very much with the running thereof, and so much as to compel the proprietors of the mills to abandon the use of one wheel. The object of the suit is to obtain a decree, declaring and establishing the lawful height of Outcalt's dam, and compelling the defendants to reduce it to such height, and enjoining them from backing water by means of the dam upon the platforms or sheathings at the Railroad Mills. John Outcalt alone has answered. He is the lessee and occupant of Outcalt's mills, and runs them in his own business.

The complainants' mill site is an old one. It was used early in the present century for a grist mill and distillery. Afterwards it was used for a snuff, or snuff and tobacco mill. Down to about 1874, so far as the recollection of the witnesses goes, there was but one building upon it, and that had but one (wooden) water-wheel. The wheel was what is called a breast wheel. The mill and wheel and the head-race leading the water from the pond to the mill were located on the east side of the brook. The platform or sheathing under that wheel was about four inches above the water in the brook, which, as before stated, is the tail-race. In 1854, the wheel that was then in the mill was taken out, and another put in its place over the same sheath-

ing. That wheel remained until about 1874, when it was taken out because of the back-water, and a turbine wheel, which it was supposed would work to better advantage, and not be so much obstructed by the back-water, was substituted in its stead. That wheel proved unable to work to advantage in the back-water, and it was taken out about 1877, and the use of water-power in that building was abandoned, and steam-power was substituted therefor. The head-race was filled up, but the sheathing was left undisturbed, and it has remained there ever since. About 1854 a new mill building was put up on the west side of the brook, in which a water-wheel (a breast wheel) was put, and a head-race to it constructed. The sheathing under that wheel was placed about eight inches above the surface of the water in the brook at its ordinary height. The sheathing under the wheel on the east side of the brook was, it will be remembered, but four inches above the surface of the water in the brook. In 1885, after this suit was brought, the wheel on the west side of the brook was taken out, and another of the same kind, size and construction substituted therefor. The sheathing thereunder was taken up, and other sheathing put in the place of it at the same height from the water on the under side, but the planks of the new sheathing were half an inch thicker than those of the old. From what has been said, it appears that from about 1854 to about 1874 the mills had two breast wheels, from 1874 to 1877 but one, and a turbine wheel, and from 1877 a breast wheel only. So far as the memory of man extends, there was neither mill, nor pond, nor dam upon the Outcalt Mills property until about 1824 or 1826, at which time the Railroad Mills property had long been occupied as a mill site. John Outcalt's grandfather, Judge Outcalt, built the first mill which was ever upon the Outcalt property, within the recollection of any one living. There are witnesses who remember when there was no mill, nor pond, nor dam upon the property. From Judge Outcalt the property went to his son, John D. Outcalt, who died in 1855, and John Outcalt, who was the son of John D. Outcalt, then became the owner. About 1882 it passed from him by sale under foreclosure proceedings to David D. Acker,

trustee, and since then Outcalt has continued to occupy it as lessee.

It is clear from the evidence that up to about 1872 the Railroad Mills were never troubled with back-water on the sheathings, except in time of freshet, and that from that period their water-wheels were almost continually impeded by such obstruction. It is also clear, not only from the evidence, but from the admissions of the answer, that about that time Outcalt raised the dam at his mills about two feet higher than it then was. In his answer, he says that he built a dam at the present height about the year 1869, and that it has not been raised or varied in the slightest degree since that time; and that although the head is some two feet higher than it was kept by some of the intermediate dams, it is a foot lower than the old Indian embankment which existed for some two hundred feet, within his recollection. It appears from his testimony that he raised the dam (as to one foot with the flash-boards) two feet higher than it was in his father's time. His father repeatedly said, while he was the owner of the property, that the height to which he had a right to raise his head of water was seven feet above the water at the foot of his dam. Generally, however, he did not raise it higher than six feet and a half. An effort was made by Outcalt to cast discredit upon the testimony of John Bowers, an important witness for the complainants, on this head, by showing that he is probably much younger than he says he is. He testified that he was about seventy years of age when he was sworn. It appears that he was born in or about 1828, probably, so that when he testified as to his age (in 1884) he was about fifty-six years old. He says he does not know his age. If he was born in 1828, he was old enough, when he was in the employ of Outcalt's father, to take notice of and remember the things as to which he gives testimony. He says he went to work for Outcalt's father in 1847 or 1848, he thinks, and worked there for about two years. If he was born in 1828, he was nineteen or twenty years old when he went there, and twenty-one or twenty-two when he left. He began to work steadily at the complainants'

mills in 1854, and has worked there ever since. If he was born in 1828, he was twenty-six years old in 1854. He says that the last year that he worked for Outcalt's father he was foreman and had charge of the water.

There appears to have been no warrant for the raising of the head of water above seven feet from the surface of the water at its ordinary stage at the foot of the dam. It is urged that the dam is part of an ancient dam, which was once known as Weequehalaw's Upper Saw Mill Dam, which it is said was owned by an Indian chief named Weequehalaw; that part of the Indian dam still remains, and is the embankment which constitutes part of the dam in question, and that the Indian dam, judging from the embankment, was still higher than the other part of the dam after it was raised by Outcalt. Although the answer states that Outcalt's father claimed the right to raise the dam to the height of the old Indian dam, there is no proof of it, and indeed there is no evidence of any importance as to this so-called Indian dam. It is said in the answer that Outcalt's mill dam was once known as the Lower Indian Dam, and was described in the early deeds as Weequehalaw's Lowermost Saw Mill. But it appears from the testimony adduced by Outcalt that the dam of that saw-mill was in another place, and the witness says that the dam in question was Weequehalaw's Upper Saw Mill Dam. Surveys of 1722 and 1752 are produced, in which Weequehalaw's Lowermost Saw Mill is referred to. But there is no evidence offered, except tradition, as to the upper saw-mill. Weequehalaw's saw-mills appear to have existed over one hundred and fifty years ago, and it is quite probable that the places of the dams were referred to in conveyances merely as land-marks long after the dams had ceased to exist and the mills were gone. There is no evidence that the dams existed at the dates of the surveys of 1722 and 1752. But if it be conceded that Outcalt's dam is in the identical place which of old was occupied by either of those so-called Indian dams, it is of no consequence in deciding this cause. It is certain that there was neither mill, dam nor pond there when Judge Outcalt, John Outcalt's grandfather, built his mill there. Up to that time there had been

neither mill, pond nor dam there within the memory of man. No right to raise the water can be deduced from the height of the embankment of the so-called Indian dam. Not only is the fact that Outcalt raised the dam two feet established, but it is established also that that was the cause of the back-water of which the complainants complain. As already stated, before the dam was raised there was no back-water at the Railroad Mills, except in time of flood. After the dam was raised, the water backed up in the Manalapan for a distance of over two miles from the dam.

The notable evidences and consequences thereof were very numerous and unmistakable. Among them were the diminution in the current of the Manalapan from activity to sluggishness, attributable to no other cause; the submerging of an island in Outcalt's mill-pond; the raising of the water in the river to an unwonted height up to the top of its banks, up to and above Little Mill brook, and the raising of the water in the brook so as to flood the sheathing at Railroad Mills; the killing, by the rise of the water in the river, of trees upon the banks; the submerging of the sills of the old Forge dam; and the submerging of the Forge bridge and the Forge road. Outcalt admits that his dam backs the water as far as Laurel Hill, which is only one-eighth of a mile, or six hundred and sixty feet, below the mouth of the brook, but he claims that it backs it no further. The testimony of the civil engineers establishes the fact that it backs the water up to and beyond the sheathing of the complainants' mills. That testimony, it may be added, furnishes clear proof that the back-water complained of is entirely attributable to the raising of the dam. According to the leveling and calculations of Mr. Weston, if the water in Outcalt's pond be raised to the full height of the flash-boards, it will cause back-water to stand on the sheathing of Railroad Mills to the depth of four and a half inches. According to Mr. Tice's levels, if the water in the pond be at the full height of the flash-boards, it will cause back-water on the sheathing of complainants' mills to the depth of nine and three-eighths inches. Those engineers were called by the complainants. Mr.

Outcalt v. George W. Helme Co.

Homman, Outcalt's engineer and witness, testifies that accord-
ing to his levels, the level of the top of the flash-boards of
Outcalt's dam is five and three-eighths inches above the com-
plainants' sheathing.   His levelings, made March 25th and
29th, 1885, of the surface of the water, show that the dam
backs water to a greater depth.   The first of those levels was
made at half-past ten o'clock at night, when Buckalew's mills
(on the Manalapan, above the Railroad Mills), Railroad, and
Outcalt's mills were all shut down.   He then found that the
level of the water at the sheathing of the Railroad Mills was
two and a half inches below the sheathing.   But the water at
Outcalt's dam stood nine and a half inches below the top of
the flash-boards.   So that if the water in the pond had been up
to the full height of the flash-boards, it would have caused
seven inches of back-water on the sheathing of Railroad Mills.
The other level referred to was made on Sunday, when all the
mills were shut down.   The water at the complainants' mills
stood an inch and a half deep on the sheathing.   But Outcalt's
pond was not full; the water in it stood five and a half inches
below the top of the hand-boards.   Had it been full up to the
top of the boards, the water would have stood seven inches
deep on the sheathing of the complainants' mills.   The proof
on the part of the complainants is that in ordinary conditions
of the water the back-water on the sheathing since 1872 has
stood at the depth of from ten to twenty inches.   There can be
no reasonable doubt that the effect of the raising of Outcalt's
dam two feet has been to pen back, and so store for the use of
Outcalt's mills the water in the river and brook to a point far
above and beyond the complainants' mills.   The consequence
is that the brook, up to and beyond the latter mills, is not only
full of water comparatively stagnant, whereas before such rais-
ing of the dam it was almost empty when no water came from
the wheels of those mills, but it is so raised as to flood the
sheathing to the depth sometimes of almost two feet.   The fact
that Outcalt says that the raising of the dam was done before
1872 in nowise prevents the conclusion that this back-water is
due to such raising, for one foot of the height of the dam was

added by means of hand or flash-boards. · It does not appear that he kept or had his pond full up to the full height of the flash-boards before 1872. Indeed, it appears from his testimony· that it was not until 1872 that he put in his second wheel. That wheel was somewhat larger than the other, and required more water. It may be added that he says that he raised the cap-piece in 1872. He insists that the water in the pond, if raised to the height of the top of the flash-boards, would not be higher than it has been maintained by his predecessors. Not only is the weight of evidence decidedly to the contrary, but he does not, in his answer, make such claim. He says, as before stated, that although the head is some two feet higher than it was kept by some of the intermediate dams, it is a foot lower than the old Indian embankment, which existed for some two hundred feet within defendant's recollection. All that is claimed in the answer on this point therefore is that the head was kept as high as the top of his flash-boards by some of the intermediate dams. But there is no proof that the water was kept so high by any intermediate dam. In his testimony he says that he raised the dam to its present height so as to hold the water higher. He gives as his reason for raising it that the Manalapan had been straightened below Englishtown, and by Mr. Buckalew, and that the owners of the complainants' mills had obtained the control of more water than they had ever had before. It may be remarked that the first-mentioned straightening was done, as he himself says, about 1855; the Buckalew cuts were made about forty years ago, and not only does it not appear that the proprietors of the Railroad Mills property had, when he raised the dam, added to their supply of water, but, on the contrary, it appears that they had not done so. And here reference may be made to the testimony of four witnesses, Levi Bennett, John M. Applegate, William Mabley and Outcalt himself, as to the height of the water while Outcalt's father and grandfather were owners of his mill. They testify that a certain platform of planks was regarded as a criterion, and that according to that criterion the water was kept no higher by Outcalt than it was by his predecessors. The testimony on

Outcalt *v.* George W. Helme Co.

this point is too vague and uncertain to be of any value. Outcalt distinctly admits that he raised the water about two feet higher than it had been before. To refer more particularly to his testimony on that point : he says that from 1864 to 1868 the pond was out ; that in the latter year he rebuilt the dam, but did not raise it ; that in 1869 he raised it higher than the preceding dams, and that after that he raised it again by means of the hand-boards. He raised the cap-piece which was on the dam in his father's lifetime about two feet, and he says that this was done in 1872. He admits that he raised the dam from eighteen inches to two feet higher than it was in his father's lifetime. He will not say that he did not raise it as much as two feet higher. It appears that in a suit which John M. Bennett, who owned land on the Manalapan about one-quarter of a mile above the complainant's mills, brought against him to recover damages for flowing his land, and in which, in 1880, the plaintiff recovered a judgment for damages, Outcalt testified that he raised the dam two feet.

Outcalt insists also that he has a right to flow the complainant's mill site under a reservation contained in a deed from Robinson Thomas to John Bowne, dated June 1st, 1805, by which the grantor reserved to himself, and his heirs and assigns, the right of overflowing as much of the land thereby conveyed as he, or any other person under him, should think proper, for the use of a mill pond; and also for using so much land on the bank of the Manalapan as might be useful for erecting any mill or mills, or anything necessary or useful therefor, by paying the grantee at the rate of three pounds York money per acre for every acre so covered with water, or used for buildings or other conveniences. It is conceded, by the stipulation of counsel, that the title to the Outcalt dam and mill property was in Samuel Culver in 1790, and that the defendants claim title under him. They do not hold under Robinson Thomas, and of course have no claim to the benefit of that reservation.

The owners of the complainants' mill have, from time immemorial up to the time when their enjoyment of it was interrupted by John Outcalt, enjoyed the right for the vindication of which

43

this suit was brought. The injury is of an irreparable character. The diminution of power, caused by the back-water, embarrasses and damages them in their business. Outcalt had no right to raise the water in his pond above seven feet from the surface of the water in its ordinary condition at the foot of the dam. He has provided, by his dam and flash-boards, for raising it two feet higher, and he has persisted, against remonstrances, in maintaining his head of water above the seven feet. The defendants should be enjoined from raising the water in the pond, or permitting it to be raised by means of their dam or flash-boards thereon above the seven feet, and they should be required to reduce the height of the dam accordingly. This is necessary in order to restore and secure to the complainants the right which the owners of their mills possessed and enjoyed when Outcalt raised the dam. He has produced no evidence that either his father or grandfather had or ever claimed to be entitled to a head above the seven feet.

There will be a decree in accordance with this opinion.

*Mr. R. Wayne Parker* and *Mr. C. Parker,* for appellant.

*Mr. Edward W. Strong* and *Mr. Alan Strong,* for respondent.

The opinion of the court was delivered by

DIXON, J.

The complainant is the owner of the "Railroad Mills," situate in Middlesex county, on the Mill brook, near its entrance into the Manalapan river. The defendant, who appeals, is the occupant of the Outcalt Mills, situate on the Manalapan river, about a mile below the junction of the brook and river. Both mills use water-power.

The bill was filed in April, 1884, and its ground of complaint is that in 1872 the dam at the Outcalt Mills was raised by appellant to such a height, and has since been so maintained by him, as to throw the water of the river and brook back upon the tail-race and wheel of the complainant's mills. It prays a

decree that the dam may be lowered to a specified level, and that the defendant may be restrained from holding the water of the streams back upon the complainant's tail-race and wheel.

The appellant in his answer avers that he and those under whom he holds have a prescriptive right to maintain the dam at Outcalt Mills at its present height, denies that the dam erected in 1872 was raised higher than the dam had theretofore been, and asserts that if the complainant's tail-race is flooded, the causes are, not any change at the Outcalt Mills, but these facts: first, that between 1866 and 1872 the complainant's predecessors in title turned into Mill brook the waters of Bennet brook and Cedar brook; second, that the mill-pond of complainant, and other mill-ponds on the Manalapan river, above Mill brook, have been enlarged, so that an increased accumulation of water is let down during working hours; third, that between 1870 and 1873 the course of Manalapan river was straightened by a cut-off just above the mouth of Mill brook, whereby the waters up the stream were poured into the bed of the river below the brook more rapidly than before, which three causes have choked the channels of the brook and river below complainant's mill with water much beyond their capacity to discharge; fourth, that these changes in the currents have resulted in deposits at and below the mouth of Mill brook, which have tended still further to raise the surface of the water; and fifth, that the complainant and its predecessors have not taken proper pains to remove snags and other obstructions which hinder the flow of the streams.

The answer also insists that the complainant is not entitled to the aid of a court of equity, and prays the same benefit of this defence as if it had been made by plea or demurrer.

It is evident that the issues raised by these pleadings are such as should be tried at law. The ground of suit is an alleged invasion of the complainant's legal estate in land, by means of a structure, said to be unlawful, on the defendant's land. The defendant contends that his structure is lawful, denies that it creates any interference with complainant's estate, and asserts the existence of several facts which tend to show him free from

responsibility for the damage which the complainant suffers. Every question to be decided is, therefore, one of mere legality or one of fact. The complainant's right to relief is not admitted, neither can it be made clear until the defendant's averments are overthrown, nor is there in the case any other circumstance which, according to *Hart* v. *Leonard, 15 Stew. Eq. 416,* would warrant the interposition of a court of equity before the right is established at law.

The complainant's counsel urges that the injury sustained is of the sort which equity deems irreparable; but it consists only of the diminution of water-power in the mill, and was endured for twelve years before bill filed, and we think that the law prescribes reasonable rules for giving adequate compensation for such a loss, and that they are no more difficult of application by a jury than are the rules for estimating damages in other cases which undoubtedly pertain to the legal tribunals alone.

The complainant's claim must be supported by a judgment against the defendant at law before it can successfully invoke the aid of a court of equity.

On this decision being made known, the complainant moved that our decree should provide for the retention of the bill until a trial could be had at law, to the end that if the trial resulted in favor of the complainant the injunction asked for might be granted in the present suit.

When the object of a bill is to secure affirmative equitable relief, and one of the grounds upon which the right to such relief rests is a legal title, as in suits for partition, for assignment of dower, for an account upon the infringement of a patent, then, if the legal title is disputed, the usual course is to retain the bill until the title is settled at law. *Wilkin* v. *Wilkin, 1 Johns. Ch. 111; Manners* v. *Manners, 1 Gr. Ch. 384; Palmer* v. *Casperson, 2 C. E. Gr. 204; Bacon* v. *Jones, 4 M. & Cr. 433.* The reason is obvious, since, after the legal title is ascertained, the necessity for the intervention of equity remains, and the dismissal of the bill would only multiply costs and delay. But when the real *gravamen* of the bill is the unconscientious refusal of the defendant to yield to the complainant the enjoyment of his legal

Outcalt *v.* George W. Helme Co.

estate, as it is in bills like the present, for nuisance or for trespass, then (in the absence of other recognized grounds of equitable jurisdiction) a condition precedent to the right of the complainant to bring his adversary into the court of conscience is that the latter's misconduct shall be admitted or shall have been established at law against him, for only such misconduct can be deemed unconscientious as well as illegal.   The reason for appealing to the court of equity is that the necessity of several suits against a defendant whose perverseness is manifest may be obviated.   *1 Pom. Eq.* §§ *245, 252.* When a bill of such a nature is filed before the disputed claim is settled in the proper tribunal, it should not ordinarily be retained, pending the legal litigation, with the view of thereafter making a decree against the defendant, because it is to be assumed that he will submit to the final judgment at law and regulate his conduct accordingly, and therefore that such a decree will be unnecessary and would burden him with the costs of a suit which should not have been brought against him.   In the present case the inequity of retaining the bill is strengthened by the fact that the objection to the jurisdiction of the court was promptly taken in the answer, and yet the complainant never suggested the bringing of an action at law until this appeal was decided against it. *First National Bank* v. *Bininger, 11 C. E. Gr. 345 ; Bacon* v. *Jones, 4 M. & Cr. 433.*

The decree against the appellant should be reversed, and the bill as to him should be dismissed for want of jurisdiction, and without prejudice to a suit at law.

*Decree unanimously reversed.*